**GENERAL MOTORS CORPORATION, Plaintiff,**

v.

**Robert ABRAMS, Attorney General of the State of New York, Defendant.**

**No. 86 Civ. 9193 (CSH).**

United States District Court, S.D. New York.

Jan. 18, 1989.

---

**1104**

Weil, Gotshal & Manges, New York City, for plaintiff; Richard J. Davis, Carl J. Munson, Jonathan M. Polk, Francis H. Dunne, David A. Collins, George Velez, of counsel.

Robert Abrams, Atty. Gen., State of N.Y., New York City, for defendant; Peter Bienstock, Asst. Atty. Gen., In Charge John W. Corwin, Stephen Mindell, Doris Ling, Mary M. Gundrum, Asst. Attys. Gen., of counsel.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant's motion to dismiss the complaint and plaintiff's cross-motion for summary judgment raise the issues of (1) whether a Federal Trade Commission consent order can ever preempt state legislation; and (2) if it can, whether a particular consent order negotiated by the Commission and plaintiff preempts New York's "Lemon Law."

### I

The Federal Trade Commission (FTC) was established by Congress in 1914 as an independent agency of the federal government. The FTC is empowered and directed by Congress to prevent, among other things, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce" by persons, partnerships or corporations. 15 U.S.C. § 45(a)(1). Congress authorized the FTC, when the latter had reason to believe that such prohibited acts were occurring, to "issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing ..." § 45(b). The statute further authorizes the FTC, after the hearing, to issue cease and desist orders. *Ibid.* The FTC is further authorized to compromise litigation it initiates by the entry of consent orders. *See, e.g., Russo v. Texaco, Inc.*, 630 F.Supp. 682, 684–85 (E.D.N.Y.), *aff'd*, 808 F.2d 221 (2d Cir.1986).

In 1980 the FTC issued a complaint against plaintiff General Motors Corporation (GM), charging that it failed to notify consumers about serious problems, or "defects," in certain cars and light trucks GM manufactured. *General Motors Corp.*, 102 F.T.C. 1741. The complaint alleged three specific defects in the powertrain components of a large number of GM vehicles. Before trial, counsel for GM and the FTC negotiated a proposed consent agreement and order, which the FTC preliminarily approved and published for public comment. 48 Fed.Reg. 20730 (1983). After reviewing

the public comments, which included written and oral objections of numerous states attorney general (including New York's) that the order gave insufficient protection to consumers, the FTC approved and issued the order on November 16, 1983. 102 F.T.C. 1749. Section IV of the consent order requires GM to "implement a nationwide third-party arbitration program to settle complaints of individual owners relating to powertrain components." *Id.* at 1761.

GM implemented that arbitration program. In September 1986 Daniel Oliver, the FTC's chairman, was able to announce that over the first twenty months of the program, more than 100,000 consumers received in excess of $40 million in awards and 97 percent of those completing the program received an award. GM says in its motion papers, without contradiction, that over $3,000,000 of this amount went to New York residents. Affidavit of Francis H. Dunne at ¶ 12. Chairman Oliver went on to say that "these statistics, impressive as they are, significantly understate the program's entire range of benefits to consumers. They represent awards for only the three components specified in the FTC's complaint against GM. They do not reflect payments for other engine or transmission problems covered by the Commission's order (which was broader than the complaint) ..." Oliver September 1986 statement, attached as Ex. 5 to Dunne affidavit.

In 1983, the New York legislature enacted its "Lemon Law," codified as § 198–a of the state's General Business Law (GBL). The 1983 Lemon Law created for the first time in New York a statutory warranty. Car manufacturers were required to repair free of charge any new car which did not conform to all of the manufacturer's express warranties for a statutorily specified period of time: the earlier of the first 18,-000 miles of operation, or two years from delivery. § 198–a(b). If the manufacturer, its agents or authorized dealers could not repair any defect or condition "which substantially impairs the value of the motor vehicle to the consumer after a reasonable number of attempts," the car was branded beyond hope of redemption a "lemon," and

the manufacturer required to give the purchaser, at the latter's option, a full refund or a new car. § 198–a(c). A "reasonable number of attempts" was defined by the statute as four attempts, or if the car was out of service for repairs for a cumulated total of 30 or more days. § 198–a(d). Car purchasers were granted a private right of action to seek Lemon Law remedies in court, § 198–a(j); however, before going to court, purchasers were required to resort to a manufacturers arbitration program if the manufacturer had one, and if that program was in compliance with federal regulations promulgated pursuant to the federal Magnuson–Moss warranty—Federal Trade Commission Improvement Act, §§ 101 *et seq.,* codified at 15 U.S.C. §§ 2301 *et seq.* (1982).

In 1986, the New York legislature amended the state's Lemon Law. One of the 1986 amendments required that if, and only if, a manufacturer offers an arbitration program to New York consumers, that program must include the Lemon Law remedies. That is to say, if an arbitrator determines that a car has a defect which substantially impairs its value, and which has not been repaired after a reasonable number of attempts (statutorily defined), then the purchaser must be offered the option of a full refund or replacement. GBL § 198–a(g), (m)(1)(iii). Other 1986 amendments to the New York Lemon Law required arbitrators to be trained and familiar with the terms of that statute, and permitted consumers to make oral presentations during arbitration, § 198–a(m)(1)(i); required that the arbitration system comply with federal law to the extent federal law applies, § 198–a(m)(1)(ii); required that consumers be provided with a Lemon Law "bill of rights" at the time of arbitration, § 198–a(m)(2); and directed that certain prescribed records be kept by the manufacturer, § 198–a(m)(3).

The 1986 amendments to the New York Lemon Law provide, in § 198–a(g), that "[i]f a manufacturer has established an informal dispute settlement mechanism," then that "mechanism" must provide the Lemon Law remedies, including the pur-

chaser's option of refund or replacement in the event of specified circumstances. As noted, GM was required by the FTC consent order to implement a nationwide arbitration program in respect of the defects addressed by that order. New York is a state of the federal union; and, in obedience to the consent order, GM has implemented the form of arbitration contemplated by the consent order in that state. It necessarily follows, the defendant Attorney General argues, that GM has "established an informal dispute settlement mechanism" in New York within the ambit of the Lemon Law; and consequently GM must comply with that statute, including the 1986 Amendments.

When the Attorney General made his perception manifest, GM commenced this action to declare the Lemon Law preempted as to it by the FTC consent order, and accordingly unenforceable. The Attorney General moves under Rule 12(b)(6), F.R. Civ.P., to dismiss the complaint for failure to state a claim upon which relief can be granted. GM cross-moves for summary judgment granting it the relief demanded in its complaint.

The briefs and affidavits, together with affidavits submitted in respect of GM's summary judgment motion, clearly delineate the two decisive issues. The first is whether a FTC consent order can ever, in any circumstances, preempt state law. The second issue is whether, assuming consent orders may have preemptive power, under the specific facts of this case the order entered by the FTC in 1983 involving GM preempts the 1986 amendments to New York's Lemon Law. The Attorney General contends that consent orders can never preempt state law; but if they could, the consent order at bar does not preempt the statute at bar. GM argues that consent orders can preempt state law, and that this one does so.

It seemed to me useful to invite the FTC to submit a brief *amicus curiae* on these two questions. That invitation produced two responses. The first is a brief of the FTC as *amicus curiae*, signed by members of the agency's office of general counsel.

That brief argues that FTC consent orders may preempt state law in principle, but that in practice this particular order does not preempt this particular statute.

The Court's invitation also produced a "statement" of FTC Chairman Oliver. Chairman Oliver agrees that FTC consent orders can have preemptive effect upon state laws. In his view, however, the consent order at bar operates to preempt the Lemon Law.

The Attorney General objects to the submission of Chairman Oliver's statement, which in judicial parlance we would call a dissent. The Attorney General says I should not consider the agency chairman's response because it does not speak for the Commission. I do not agree. My invitation to the agency constituted a request by a court (*curia*) for assistance from a friend (*amicus*). One cannot have too many friends in this troublous world; and that is true, even if friends may disagree with each other. In this case, two friends in a position to do so undertake to assist the Court. I am grateful for, and will consider, the contributions of both.

## II

The threshold issue is whether an FTC consent order of the sort at bar can ever preempt state law. If it cannot, all other issues become moot.

The Supremacy Clause of the Constitution, Article VI, Cl. 2, lies at the heart of the issue. It provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Framers of the Constitution may not fully have contemplated the proliferation of federal regulatory agencies which lay in the future. But the Supremacy Clause is not limited to federal statutes. It is now well settled that "[f]ederal regulations

have no less pre-emptive effect than federal statutes," if the regulations fall within the agency's statutory authority and are not arbitrary. *Fidelity Federal Savings & Loan Association v. delaCuesta,* 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982). Indeed, Judge Sand has recently held for this court that the FTC regulations promulgated pursuant to the Magnuson–Moss Act, previously cited, preempt certain provisions of the New York Lemon Law. *Motor Vehicle Manufacturers Association of the United States Inc. v. Abrams,* 697 F.Supp. 726 (S.D.N.Y. 1988).[1]

The case at bar involves a federal agency's consent order, rather than its regulations. The Attorney General observes in his main brief at 9: "There simply is no federal precedent for preempting a state law on the basis of an agency consent order."

Strictly speaking, that appears to be true. The parties do not cite, and the Court has not found, a federal case giving preemptive effect to a federal agency's order over a state statute. However, in *New England Telephone and Telegraph Company v. Public Utilities Commission of Maine,* 570 F.Supp. 1558, 1570 (D.Me.1983), the district court held that a Federal Communications Commission order requiring the use of certain depreciation methods in the calculation of intrastate telephone rates preempted the orders of state regulatory bodies. And a state intermediate appellate court cited *New England Telephone,* together with the Supreme Court's decisions in *Fidelity Federal, supra,* and *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), in holding that an FTC consent order preempted state statutes.

That case is *State ex rel. Van de Camp v. Texaco, Inc.,* 193 Cal.App.3d 8, 219 Cal. Rptr. 824 (Cal.App. 3 Dist.1985), *aff'd. on other grounds,* 46 Cal.3d 1147, 252 Cal. Rptr. 221, 762 P.2d 385 (Cal.1988). In *Van de Camp,* the California Attorney General brought an action under the state antitrust and unfair competition laws to enjoin Texa-

co from acquiring the California assets of Getty Oil Company pursuant to a merger between the two companies. The FTC had previously entered a consent order which completely regulated the anticompetitive aspects of the merger in question. That order, the California Court of Appeal held, preempted the state statutes. Citing *Capital Cities, Fidelity Federal,* and *New England Telephone,* the court said at 219 Cal. Rptr. at 830: "Federal regulations, rulings, and orders of administrative agencies have no less preemptive effect than federal statutes." The California Supreme Court, dividing 4–3, affirmed the judgment of the Court of Appeal; but the majority did not reach the preemption issues because it concluded that neither state law regulated a merger. 252 Cal.Rptr. at 222, 762 P.2d at 386. The three dissenting justices concluded that the state antitrust statute applied to the merger in question; and, within the antitrust context, the FTC consent order in question did not preempt the state antitrust statute. I do not understand any of the California Supreme Court justices to be saying that a consent order can never preempt the enactment of a state legislature.

General Motors in the case at bar, in addition to citing *Capital Cities* and *Fidelity Federal,* quotes this language from *Louisiana Public Service Commission v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986): "Pre-emption may result not only from action taken from Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." GM main brief at 18–19. In *Louisiana* the Court held that FCC orders respecting the depreciation of telephone plant and equipment did not pre-empt state regulation. The Court reached that conclusion by subjecting the federal and state regulatory action to familiar preemption analysis. There is no suggestion that the FCC's orders could not have preemptive effect because they were "only" orders, and not regulations. Having said that, it must also be acknowledged that the orders were in-

---

1. In the case at bar, the Attorney General says     Judge Sand is wrong. I think he is right.

dustry-wide in their scope, and not limited to the resolution of particular disputes between the agency and a single private party (such as GM). Thus the orders involved in *Louisiana* may be more closely analogous to regulations than to the consent order at bar.

It is fair to say that while GM can point to no federal case explicitly holding that a consent order such as this preempts a state statute, neither can the Attorney General point to a case, federal or state, holding that a consent order can never have that effect. *Van de Camp, supra,* is a state court holding at the intermediate appellate level, which squarely supports GM on this threshold issue. To the extent that the more recent, general statements of the Supreme Court point in either direction, they appear to favor GM.

As noted, the FTC's brief *amicus* and Chairman Oliver's dissenting statement both conclude that an FTC consent order has the power to preempt a state statute. The brief *amicus* relies upon the general statements in *Louisiana, Capital Cities,* and *Fidelity Federal* (brief at 5–6). The FTC also argues that the legislative history of the FTC Act "makes clear that the Commission, like any other federal agency, may preempt state laws when necessary to carry out its mission." Brief at 6. Following an analysis of that history, the FTC says of the relevant case law: "Although all these cases involved Commission rulemaking (which is more likely to raise questions of preemption because of its industry-wide impact), there logic is no less applicable to Commission orders." Brief at 7. The FTC cites the California Court of Appeal's decision in *Van de Camp, supra,* for that proposition. Chairman Oliver's dissenting statement is confined to the reasons for his disagreement with the brief

*amicus* that the consent order does not preempt the Lemon Law. He necessarily assumes that FTC orders can, in proper circumstances, have preemptive effect.

I reject the Attorney General's contention that federal regulatory agency orders can never preempt state law. The Attorney General focuses on the document's form: regulation or order? But the meaningful constitutional focus is upon substance: did Congress authorize the document, be it regulation or order? The Attorney General exalts form over substance; but he articulates no reason for doing so, nor can I discern one. A federal agency *"acting* within the scope of its congressionally delegated authority," the Supreme Court wrote in *Louisiana,* "may pre-empt state regulation." (Emphasis added.) The FTC, endowed by Congress with broad discretionary power to protect consumers, may act in a variety of ways. Some problems require industry-wide regulations. Others more appropriately yield to orders. The case at bar is one of those. The FTC charged a single car manufacturer with nationwide, but not industry-wide, conduct dangerous to consumers. The agency filed a complaint, as Congress authorized it to do; and when General Motors resisted, the FTC negotiated a consent order, a resolution also authorized by Congress. A nationwide order binding a single manufacturer made sense; industry-wide regulations in response to this serious but limited problem would have made none. No case can be made for depriving sensible federal action of preemptive effect solely because it did not take a form inappropriate to the problem addressed. The threshold question in preemption turns not upon the form of the federal action, but the agency's authority to act.[2] In the case at bar, the

2. The Attorney General cites a number of cases for the proposition that FTC consent orders are construed as contracts. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *United States v. Armour Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971); *May Dept. Stores Co. v. First Hartford Corp.,* 435 F.Supp. 849, 852–53 (D.Conn.1977). These cases considered, in differing contexts, whether consent orders had been violated. They did not

involve the question of preemption, and do not assist in its solution. Indeed, taking the contract analogy to its logical conclusion leads the Attorney General into constitutional shoal waters of a different sort. If the consent order at bar be viewed as a congressionally authorized contract between the FTC and GM, the Contract Clause of Article I, Section 10, cl. 1 prohibits state law from impairing the obligations arising thereunder.

Attorney General does not dispute the authority of the FTC to issue the consent order. Whether or not the order preempts this state statute depends upon traditional Supremacy Clause analysis.[3]

### III

Having concluded that the FTC–GM consent order at bar may preempt state law if it satisfies Supremacy Clause criteria, I must consider those criteria.

■ Preemption *vel non* depends upon ascertaining the intent of Congress. *California Federal Savings and Loan Association v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). Preemption "is not lightly to be presumed," *California Federal Savings,* 107 S.Ct. at 689, particularly when Congress legislates in a field traditionally occupied by the states, such as consumer protection and warranty law. *Pacific Gas & Electric Co. v. Energy Resources Commission,* 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983); *Chrysler Corp. v. Texas Motor Vehicle Commission,* 755 F.2d 1192, 1205 (5th Cir. 1985).

■ Clearly preemption occurs when Congress expressly states its intention that state law be preempted. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). But GM does not suggest express preemption in the case at bar. Accordingly the arguments of the Attorney General and the brief *amicus* that the consent order nowhere expressly undertakes to preempt state law do not fully meet the issues.

■ There are several well-recognized forms of implied preemption. Federal action preempts state action by implication where the scheme of federal regulation is so comprehensive that it is reasonable to infer Congress intended to "occupy the field," leaving "no room" for supplementary state regulation. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). However, complete displacement of state regulation by federal regulation in a certain field is not necessary. Conflict between federal and state action may arise, even in the absence of total displacement. Thus the Supreme Court stated in *Fidelity Federal, supra,* at 153, 102 S.Ct. at 3022.

3. Chairman Oliver's dissenting statement argues that the preemption issue need not be reached because "the most reasonable interpretation of the Lemon Law is that its requirements do not apply to arbitration of disputes under the Commission's order." Statement at 9. Mr. Oliver contends, with plausible citation to the statutory scheme and New York case law, that the Lemon Law is exclusively concerned with rights under written warranties given by the manufacturer, whereas the FTC order is not concerned with warranty disputes, but rather with settling charges "that GM failed to disclose known defects"; a consumer may prevail under consent order arbitration, the chairman points out, "regardless of the existence or terms of any written warranty ..." *Ibid.*

This approach has a surface appeal. Lower courts are cautioned generally to avoid reaching constitutional issues if alternative bases for decision lie at hand. *See, e.g., Ulster County Court v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979). Furthermore, conflicts between federal and state law are to be avoided if possible: "the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted." *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U.S. 117, 127, 94 S.Ct. 383, 390, 38 L.Ed.2d 348 (1973). But I do not believe that avenue is open here. GM did not offer that

argument in its initial motion papers, although if sound it would as a practical matter entitle GM to all the relief it seeks. Predictably enough, GM expresses agreement with Mr. Oliver in a gratified but conclusory footnote in its brief addressing the FTC submissions (at 2 n. 3). But I cannot accept the argument for failure of its basic premise: that the Lemon Law covers entirely different areas from the consent order, without possibility of overlap. While the initial complaint giving rise to the consent order dealt only with "specified components" in certain GM engines and vehicles, 102 F.T.C. at 1750, the consent order, as Chairman Oliver himself observed, "was broader than the complaint," *see* p. 1105 *supra;* deals generally with all GM passenger cars or light trucks beginning with the 1984 model year (the FTC decision approving the order was filed November 16, 1983); and directs GM to "implement a nationwide third-party arbitration program to settle complaints of individual owners relating to powertrain components." New car warranties traditionally cover powertrain components. Accordingly there is an overlap between the arbitration program directed by the consent order, and the arbitration procedures mandated by the Lemon Law as amended in 1986. The constitutional issue of preemption cannot be avoided.

Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility ... or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' (Citations omitted)

As previously observed, the purposes and objectives of Congress may be divined from regulations or orders promulgated by a federal agency acting within the scope of congressional authority.

GM perceives controlling federal action in the particular arbitration program established by the consent order. That program, in GM's perception, is uniform, nationwide and voluntary, manned by community arbitrators empowered to make awards based upon what is "fair and equitable." The New York Lemon Law as amended in 1986 does violence to the federal scheme, GM argues, by replacing community arbitrators with judge-like arbitrators trained in Lemon Law principles, and required to apply that law's specific standards for liability and relief, thereby destroying nationwide uniformity. GM argues further that the program's voluntary nature is negated by the Lemon Law's requirement that its use is a precondition to a consumer seeking other relief. Lastly, GM complains that the Lemon Law adds record-keeping and other requirements to those called for by the order.

To evaluate these arguments, it is necessary to describe in more detail the particular arbitration procedure established by the consent order.

The order specifically directed to the implementation of a nationwide third-party arbitration program, binding on GM but nonbinding on consumers unless a consumer elects to accept an arbitration award. Order, Part IV(B), 102 F.T.C. 1761. The third-party arbitration program is required to be conducted in accordance with the Uniform Rules for Arbitration published by the Better Business Bureau, and other procedural sources attached to the consent order and incorporated by reference. Or-

der, Part IV(C). The affidavits on the motion show that in 1978, the Council of Better Business Bureaus, Inc. (BBB) and GM began exploring the possibility of establishing a dispute settlement mechanism specifically designed to handle consumer complaints concerning a national manufacturer. That dialogue led to the promulgation by the BBB of the Uniform Rules for Better Business Bureau Arbitrations. Thus, when the FTC and GM began efforts to settle the agency's complaint without full-scale litigation, GM's prior dialogue with the BBB, and the latter's rules of procedure, formed a focal point of discussion. This background appears from the affidavits of Francis H. Dunne, GM's Assistant General Counsel, and Dean W. Determan, at relevant times General Counsel and later Vice President, Mediation/Arbitration Division, of the BBB.

Under the BBB Rules, arbitration is an informal procedure at which both parties explain their positions to an impartial lay arbitrator or arbitrators. The arbitrators are volunteers representing broad segments of the local community. Having heard the parties, the arbitrators "are then free to make common sense adjudications based on their own sense of fairness." Determan affidavit at ¶ 8. While BBB staff members train the lay arbitrators, they are instructed in that training to "apply their own concept of fairness to the facts in the cases they hear. They are not taught the various state laws which would apply if the disputes they were hearing had been brought in court. In fact, while the arbitrators are told that they may allow parties to present the substantive law from the state where they are sitting or even from other states, they are specifically instructed that they are not to apply any particular law, but instead are to do what they personally believe is right." *Id.* at ¶ 9.

It is this concept of unstructured, equitable resolution of disputes by lay arbitrators that the FTC incorporated in the consent order. The FTC did so only after prolonged consideration, objection by certain state attorneys general, and even expressions of concern by certain FTC members. Thus Commissioner Pertschuk, in a separate statement accompanying the deci-

sion approving the settlement and consent order, opposed "case-by-case arbitrations ... without clear, binding rules for establishing responsibility ..." He characterized the contemplated arbitration under the BBB rules as "standardless mini-trials ..." 102 F.T.C. at 1744. But the FTC majority overruled this dissenting view, and approved a consent order directing GM to implement nationwide arbitration following the BBB rules.

Application of the Lemon Law to GM arbitrations would significantly alter arbitration procedures between GM and New York consumers. The Attorney General's main brief at 8 accurately summarizes the statutory requirement, derived from §§ 198–a(g) and (m)(1)(iii), "that, if an arbitrator determines that a car has a defect which substantially impairs its value, and which has not been repaired after a reasonable number of attempts, then the purchaser must be offered the option of a full refund, or replacement." In other words, the specific standards for liability and relief forming a part of the original Lemon Law are made, under the 1986 amendments, binding upon arbitrators appointed in New York in respect of a car manufacturer's arbitration program. And those statutorily derived requirements, the Attorney General submits, may validly be applied to the GM/BBB arbitration program mandated by the FTC consent order.

■ It is difficult to imagine a clearer case of federally sanctioned procedures conflicting with those of a state. Lay community arbitrators under BBB rules are entitled to do what they think is right under the circumstances. Under the Lemon Law, arbitrators must be specifically trained in that statute's provisions, and then automatically decree specified remedies if specified circumstances are proven.

So fundamental an alteration in the arbitral process requires a conclusion of preemption on two grounds. First, within the particular context of disputes between GM and its consumers, the FTC consent order occupies the field. That was the preemption rationale of the California Court of Appeal in *Van de Camp, supra;* that court's discussion at 219 Cal.Rptr. at 831 is worth quoting at some length:

In the case at bar, however, the federal government, through the consent order, has so completely regulated the anticompetitive aspects of the merger as to "occupy the field" to the exclusion of state antitrust and unfair competition laws. The order regulates the entire merger in minute detail and specifically governs those very matters to which State now seeks to apply its antitrust law—acquisition of Getty's California oil fields and pipelines. As to the anticompetitive effects of the merger, the consent order represents a "scheme of federal regulation" of the merger "so pervasive as to make reasonable the inference that [the federal government] left no room for the States to supplement it" with their own laws. (*Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459.) In our view, the "regulatory scheme [of the consent order], complete as it is in every detail, was intended to provide the whole and exclusive source of protection" against the anticompetitive effects of the merger. (*United States v. Shimer* (1961) 367 U.S. 374, 381, 81 S.Ct. 1554, 1559, 6 L.Ed. 2d 908, 913.)

That seems to me a sound analysis, fully applicable by analogy to the case at bar.

Second, the conflict between these aspects of the arbitral processes creates an obstacle to the accomplishment and execution of the full federal purposes and objectives, as expressed in the consent order. The FTC clearly intended a uniform, nationwide form of arbitration. If New York can work such significant changes upon the manner in which arbitrators arrive at their decisions, so can any state; and that single tapestry of dispute resolution specified by the order unravels.

The other distinctions pointed to by GM, while perhaps less dramatic, are also significant. In the view I take of the foregoing changes in the arbitral process, which are sufficient to require preemption, I need not discuss these other differences in detail. However, I may observe that Judge Sand, in his thorough opinion in *Motor Vehicle Manufacturers Association, supra,* focused on differences between FTC regulations and the Lemon Law in respect of

mandatory oral hearings and binding arbitration; recordkeeping and staff qualifications; and "enforcement," which involved a provision in the Lemon Law, § 198–a(m)(1)(ii), requiring arbitration proceedings to comply with federal regulations that the federal government itself had made only optional. At 737–742. Judge Sand commenced his analysis by stating: "we approach the question of whether the Lemon Law frustrates congressional policy by comparing the state and federal regulations as they affect the specific workings of the mechanisms." *Id.* at 737. He concluded that the differences in the "specific workings" of Lemon Law arbitration frustrated congressional policy as expressed by the FTC in the Moss–Magnuson Act regulations. I reach the same conclusion with respect to the Lemon Law and the consent order at bar.

Both the Attorney General and the brief *amicus* stress that the Lemon Law is intended to benefit consumers. Of course, that is true; but it does not meet the preemption issue. The brief *amicus* argues at 11: "Because the Lemon Law is designed to redress consumers, it is consistent with the order's objectives and not preempted by the order." This is a *non sequitur*. While the preemption inquiry may begin with overall design, objectives or purpose, it hardly concludes with those threshold considerations. Federal and state actions may have a common design— "to redress consumers"—and yet conflict in their procedures to such a degree that preemption is required. That is the case at bar.[4]

> Because the Lemon Law benefits consumers by setting a floor on the award to which consumers are entitled, it is not preempted by the order. However, a state law that made it more difficult for consumers to receive benefits would conflict with the order. For example, the order would preempt a state law that set a ceiling on awards by precluding an

arbitrator from awarding reimbursement or replacement unless certain conditions were met.

The argument appears to be that if state law differs from federal law to the manufacturer's advantage preemption applies, but if the difference benefits the consumer, preemption does not apply. I find no support for this proposition in law or logic. Furthermore, it entirely overlooks the useful function of a negotiated consent order as a means of resolving complex litigation, with each side giving something up to obtain that resolution. Chairman Oliver in his dissenting opinion stresses that aspect of the consent order, and expresses concern for the viability of future consent orders, if this particular argument is accepted. I share his concern, and reject the argument.

In an effort to justify or paper over the conflicts between arbitration under the consent order and the Lemon Law, the Attorney General points to two references in the documents attached to the order. One of these, The Zone Handbook for Third–Party Arbitration, Attachment A, 102 F.T.C. at 1774, states: "The Arbitrator may make any decision which the Arbitrator deems to be fair and equitable within the scope of your agreement to arbitrate, provided state law does not prohibit all or part of that decision." Secondly, the General Motors Consumers Arbitration Handbook, Attachment C, 102 F.T.C. at 1795, states that a basic principle of BBB arbitration being offered is that it is "consistent with state law." But Mr. Determan, a principal architect of the BBB rules and arbitration, argues plausibly that these references were "not meant to apply to state substantive law or to undermine the nonlegalistic approach to arbitration embodied in the program." Affidavit at ¶ 11. State procedural law, of the sort specifying the number of days required for notice of an arbitration hearing, may still apply. Nor may an arbitrator operating under the BBB rules, moti-

---

**4.** Judge Sand made the same point in *Motor Vehicle Manufacturers Association* at 737: "In determining whether the Lemon Law 'stands as an obstacle' to the full purposes of Magnuson-Moss, it is not enough to say that the ultimate goal of both laws is consumer protection. *See*

*International Paper v. Ouellette* [479 U.S. 481] 107 S.Ct. [805] at 813 [93 L.Ed.2d 883 (1987) ]. A state statute is pre-empted if it interferes with the methods by which Congress sought to achieve its goal." *Id.*

vated by a personal sense of fairness or equity, incorporate as part of the remedy an act which state law expressly forbids (such as the removal of seat belts). However, to give these references the expansive reading for which the Attorney General contends would cause narrow and necessary procedural safeguards to swallow up the entire concept of flexible, equitable dispute resolution by lay arbitrators, free of the specific standards and mandated remedies characteristic of such substantive statutes as the New York Lemon Law.

Defendant's motion to dismiss the complaint is denied. Plaintiff's cross-motion for summary judgment is granted. Settle judgment and order on seven (7) days' notice.