**GENERAL MOTORS CORPORATION,**
**Plaintiff–Appellee,**

v.

**Robert ABRAMS, Attorney General of the State of New York,**
**Defendant–Appellant.**

**No. 127, Docket 89–7338.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 8, 1989.
Decided Feb. 15, 1990.

Richard J. Davis, New York City (Weil Gotshal & Manges, New York City, Craig M.J. Allely, Gen. Motors Corp., Francis H. Dunne, of counsel), for plaintiff-appellee.

Ronna D. Brown, Asst. Atty. Gen. for Atty. Gen. of State of N.Y., New York City, N.Y. (Robert Abrams, Atty. Gen. of State of N.Y., Bureau of Consumer Frauds and Protection, John W. Corwin, Asst. Atty. Gen. In Charge, Mary Hilgeman, Jane Azia, Asst. Attys. Gen., Bureau of Appeals and Opinions, Harvey M. Berman, Asst. Atty. Gen., of counsel), for defendant-appellant.

John K. Van De Kamp, Atty. Gen. of State of Cal., San Diego, Cal., Andrea Sheridan Ordin, Chief Asst. Atty. Gen., Herschel T. Elkins, Sanford N. Gruskin, Sr. Asst. Attys. Gen., Albert Norman Shelden, Lawrence Tapper, Deputy Attys. Gen., for amicus curiae, State of Cal.

Before KAUFMAN, WINTER, Circuit Judges, and MOTLEY, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

As an independent federal administrative agency charged with preventing "unfair methods of competition" and "unfair or deceptive acts or practices," the Federal Trade Commission ("FTC" or "Commission") historically has operated in areas of dual state-federal regulation. Consumer warranty law is one example. While the protection of consumers from unfair practices is a traditional state police power function, federal laws and administrative regulations may operate in tandem with—or even preempt—state law under the Supremacy Clause of the United States Constitution, Article VI, Cl. 2.

This appeal raises the general question whether a consent order entered into by the FTC similarly may preempt state law. Unlike an agency regulation which has industry-wide effect, a consent order is binding only on the parties to the agreement. Answering in the affirmative, we also must address whether the instant FTC Consent Order requiring General Motors Corporation ("GM" or "General Motors") to operate under the auspices of the Better Business Bureau ("BBB") an informal arbitration program for resolving consumer complaints preempts either the substantive decison-making criteria or the procedural and record-keeping requirements of the New York New Car Lemon Law, ch. 799, 1986 N.Y., laws 1882, amending New York General Business Law § 198–a ("Lemon Law" or "Statute").

## BACKGROUND

The dispute arose after New York State amended its business code to require that any existing manufacturer's informal dispute settlement mechanism conform to the requirements of the State's new Lemon Law. General Motors brought suit on December 1, 1986, in federal district court seeking a declaration that certain provisions of the state Statute were unconstitutional and an injunction restraining the enforcement of these provisions with respect to GM's federally mandated consumer arbitration program. The Attorney General moved to dismiss the suit under Fed.R. Civ.P. 12(b)(6) for failure to state a cause of action for which relief may be granted. GM cross-moved for summary judgment.

Denying the State's motion to dismiss and granting summary judgment, Judge Haight of the Southern District of New York held that the 1983 FTC Consent Order requiring GM to establish a consumer arbitration program preempts the New York Statute on several grounds. The district court found that the FTC order "occupies the field," to the exclusion of state regulation, within the narrow context of disputes between GM and its consumers. 703 F.Supp. 1103, 1111 (S.D.N.Y.1989). The district court further held that the Lemon Law conflicts with the arbitral processes mandated by the FTC Order in a manner creating "an obstacle to the accom-

---

* Honorable Constance Baker Motley, Senior United States District Judge for the Southern District of New York, sitting by designation.

plishment and execution of the full federal purposes and objectives, as expressed in the consent order." *Id.*

We reverse the judgment and order of preemption and dismiss GM's complaint. While an FTC consent order may in some circumstances preempt state law, we do not believe the agreement entered into by GM and the Commission was intended to have this effect on the provisions of the state Lemon Law at issue.

We begin with a summary of the FTC negotiations and state legislation that form the background of this dispute. In 1980, the FTC issued a complaint against GM for failing to notify consumers about serious engine and transmission defects in certain GM cars and light trucks. Avoiding the expense, delay and risks of litigation, the FTC negotiated and entered into a Consent Order requiring GM to implement a nationwide third-party arbitration program, administered by the BBB, to settle complaints of individual owners relating to the defective powertrain components. 102 F.T.C. 1741, 1749. The final Order was preceded by a preliminary proposal which was published and submitted for public comment under agency rules. 48 Fed.Reg. 20730 (1983).

Despite the opposition of numerous consumers and state attorneys general (including defendant-appellant Robert Abrams of New York) to the proposed settlement, the FTC issued the Consent Order on November 16, 1983, providing for case-by-case arbitration rather than direct redress to consumers.[1]

The program established by the Consent Order marks an "experiment" by the FTC designed to assure that the consumer receives fair and equitable treatment at the hands of the manufacturer. Its principal characteristics are the use of untrained arbitrators chosen from broad segments of the community who "make common sense adjudications based on their own sense of fairness." The arbitrators might include, for example, "lawyers, professors, accountants, company executives, housewives, trade association personnel." The third-party arbitration is wholly voluntary for consumers and the results are binding only on GM, 102 F.T.C. at 1761—*i.e.,* consumer participation in GM's arbitration program is not a precondition or a bar to pursuing other remedies.

The Order provides for the BBB to administer the General Motors program in accordance with the provisions of the Consent Order, the BBB's Uniform Rules for Arbitration, the General Motors Zone Handbook for Third Party Arbitration and the General Motors Consumer Arbitration Handbook. Significant to this appeal, these documents, incorporated into the Consent Order, contain two explicit references to state law.

Section 27B of the BBB's Uniform Rules for Arbitration states:

> The arbitrator may make any decision, which the Arbitrator deems fair and equitable within the scope of your agreement to arbitrate, provided state law does not prohibit all or part of that decision.

102 F.T.C. at 1774.

Section 3 provides that "[t]he law of the state where your dispute is arbitrated shall apply." 102 F.T.C. at 1771.

Effective Sept. 1, 1983, the New York legislature enacted its original Lemon Law, codified as section 198–a of the State General Business Law. The Law created a statutory warranty requiring a manufac-

---

1. The Commission issued the Consent Order by a vote of four to one. Commissioner Pertschuk dissented in a separate statement. 102 F.T.C. 1741, 1743–44. The thrust of his position is evident in the following excerpt:

> ... case-by-case arbitrations of a *common* defect, in which each consumer has to prove a right to redress, is wrong in concept and in operation. Arbitration without clear, binding rules for establishing responsibility will still be little more than a "roll of the dice"—some

truly deserving consumers will win, many won't. The only rational and equitable remedy for the common injury suffered in a case like this is automatic compensation for damages, not standardless mini-trials pitting the individual consumer against the largest company in the world!

> *Id.*

Commissioners Patricia P. Bailey and George W. Douglas also filed separate statements explaining their votes in favor of the Order.

turer to repair free of charge any new motor vehicle that does not conform to its express warranties for a statutorily specified period of time—two years or eighteen thousand miles, whichever comes sooner. § 198–a(b).

In addition, any defect during this period "substantially impair[ing] the value of the motor vehicle" that proves unrepairable after a "reasonable number of attempts" renders the vehicle a "lemon," entitling the consumer to a refund of the full purchase price or replacement. § 198–a(c). The Statute defines "reasonable number of attempts" as four or if the vehicle is out for repair for a cumulative total of 30 or more days. § 198–a(d). These remedies are available to any consumer who first resorts to a manufacturer's informal dispute mechanism (if one exists) that complies with minimum federal standards. § 198–a(g).

The 1986 amendments to the Lemon Law added that "[i]f a manufacturer has established an informal dispute settlement mechanism, such mechanism shall comply in all respects with the provisions of this section...." § 198–a(g). Subsection (m) sets forth the "minimum" Lemon Law requirements for a manufacturer's informal dispute settlement mechanism. GM primarily challenges the requirements that arbitrators be "trained in arbitration and familiar with the provisions of [the Lemon Law]" and that they apply Lemon Law remedies. § 198–(m)(1)(i), (iii).

The major differences between the Consent Order and the New Car Lemon Law may be summarized as follows:

1) The Statute requires the consumer to resort to a manufacturer's dispute resolution mechanism before seeking judicial relief under the Lemon Law, whereas the Consent Order makes participation in the GM–BBB arbitration program wholly optional;

2) The Lemon Law specifies standards for liability and redress for statutorily determined automotive "lemons," as compared with the "fair and equitable" open standard of GM's program;

3) Under the Lemon Law, arbitrators must be "trained in arbitration," "familiar with" the New York Lemon Law, and "provided with a written copy of the provisions of" the Lemon Law, rather than merely untrained community arbitrators called for in the Order;

4) The Statute adds recordkeeping requirements to the reporting provisions contained in the Consent Order.

The New York Statute also directed the Attorney General to create an "alternative arbitration mechanism" to be conducted by professional arbitrators appointed by the Attorney General who must apply Lemon Law standards and remedies.[2] This separate arbitration forum has been available to consumers since January 1, 1987.

## DISCUSSION

I. *Authority to Preempt*

We initially must address, as a matter of first impression for this court, whether a consent order entered into by a federal administrative agency can ever preempt state law. We agree with Judge Haight's conclusion below that consent orders may be afforded preemptive weight in some circumstances.

The Supremacy Clause of the United States Constitution, Article VI, Cl. 2, provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the Supreme Law of the Land ... the Constitution or Laws of any State to the Contrary notwithstanding."

While the Framers of the Constitution could not have envisioned the burgeoning of modern administrative procedure, the Supreme Court has interpreted "laws" under the Supremacy Clause to embrace both

---

**2.** N.Y.Gen.Bus.Law § 198–a(k) provides:
Each consumer shall have the option of submitting any dispute arising under this section upon the payment of a prescribed filing fee to an alternate arbitration mechanism established pursuant to regulations promulgated hereunder by the New York state attorney general. Upon application of the consumer and payment of the filing fee, all manufacturers shall submit to such alternate arbitration.

federal statutes and administrative regulations. *Fidelity Savings & Loan Ass'n. v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes."). *See also, Hillsborough County, Fla. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes."); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (same, quoting *Fidelity* ).

The Attorney General urges us to hold that a consent order may never be accorded preemptive weight because it lacks the administrative safeguards of a regulation and does not reflect a considered policy choice of the agency. We reject this argument as an exaltation of form over substance.

■ Congress has authorized the FTC to exercise its supervisory powers under the Federal Trade Commission Act in a variety of ways—raning from industry-wide rulemaking to case-by-case adjudication, including issuing consent orders. Federal Trade Commission Act ¶ 5(a)–(g), 15 U.S.C. § 45. *See also, Russo v. Texaco, Inc.* 630 F.Supp. 682, 684–85 (E.D.N.Y.), *aff'd.*, 808 F.2d 221 (2d Cir.1986). It is well established that when developing law on a subject, an agency usually has a choice between the method of rulemaking and that of adjudication. *SEC v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). Although frequently described as *quasi*-legislative or *quasi*-judicial power, *see, e.g., Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 2618–19, 101 L.Ed.2d 569 (1988); *C.P. Chemical Co., Inc. v. United States*, 810 F.2d 34, 37–38 (2d Cir.1987), both types of agency actions have the binding force of "federal law." *See generally,* K.C. Davis, 3 *Administrative Law Treatise,* § 14.01 (1988).

■ The Supreme Court has recently stated that "[p]reemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986). Just as when reviewing a federal regulation, we should not disturb an agency's action intended to preempt state law which embodies a "reasonable accommodation of conflicting policies that were committed to the agency's care by statute." *Fidelity Savings,* 458 U.S. at 153–54, 102 S.Ct. at 3022–23 (*quoting United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). In determining whether a consent order may have preemptive effect, we focus our inquiry on whether the federal agency is acting reasonably and within the scope of its congressionally delegated authority.

The FTC was clearly authorized to enter into the instant Consent Order regulating consumer arbitration between GM and its consumers. The Commission's decision to agree to a settlement in the face of the expense, delay and risks of litigation appears to have been a reasonable policy choice, particularly in light of the intensive negotiations and extensive public comment that informed its decision. Moreover, the fact that the Consent Order is a product of compromise and negotiation does not preclude it from having the power of preemption; rather, this becomes one factor in determining whether the Commission's action was intended to have preemptive effect.

Thus, we hold that a consent order reflecting a reasonable policy choice of a federal agency and issued pursuant to a congressional grant of authority may preempt state legislation. The mere fact that the instant Order has been entered, however, is insufficient to preclude supplemental state regulation. As with any preemption analysis, the lodestar of our inquiry is the "intent" of the FTC in entering into the Consent Order.[3] *California Fed-*

---

**3.** Thus, the view of our dissenting brother that "[w]hatever the evidence of language and intent

... the matter is settled by an examination of the Uniform Rules for Better Business Bureau

*eral Savings and Loan Ass'n. v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (*citing Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983)).

## II. *Intent to Preempt*

■ The Supreme Court has fashioned clear rules for guiding our search for intent in this area. Absent an indication of express intent to preclude state regulation, preemption would be implied in two ways. The federal scheme of regulation may be so comprehensive in a specific area that it may be reasonable to infer an intent to "occupy the field," leaving no room for supplemental state regulation. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Even where there has not been a complete displacement of state regulation in a particular area, state law is preempted when it actually conflicts with federal law, so that compliance with both federal and state regulations is physically impossible, *Florida Lime & Avocado Growers, Inc v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress [or the federal agency]. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

There is no explicit statement in the FTC Consent Order of an intention to preclude state regulation. Accordingly, we must examine whether the 1983 Order was intended to "occupy the field" of GM-sponsored consumer arbitration over warranty disputes or whether it would be impossible to comply with both the FTC Order and the Lemon Law or whether compliance with the Lemon Law would frustrate the pur-

poses of the FTC Order. Specifically, we must determine whether there is anything objectionable about the Statute's requirements that consumers resort to GM's arbitration program as a precondition to seeking relief in court under the Lemon Law; or that GM's community arbitrators apply Lemon Law standards and procedures.

### A. The Requirement of "First Resort"

No one contests that New York may establish a separate consumer dispute resolution mechanism, replete with substantive and procedural regulations, in addition to GM's federally mandated program. Instead, GM challenges § 198–a(g)'s purported requirement that a consumer seeking relief under the Lemon Law first submit to a manufacturer's existing arbitration program—*e.g.,* the instant GM–BBB program. GM argues that this provision eliminates the voluntary aspect of the GM–BBB program and forecloses consumer choice by *"requir*[ing] consumers to resort to the FTC–GM consumer arbitration program as a precondition to seeking relief under the New York Statute." GM urges us to immunize its program from state legislation so that it would preserve for the consumer the "choice of opting for a non-binding informal arbitration system based on equitable judgments by lay persons." [4]

■ While recognizing that the state legislation is far from a model of clarity, we believe that GM and the dissenter partially misinterpret these provisions of the Lemon Law. We read section 198–a(g) to require a consumer to submit to a manufacturer's existing arbitration program before bringing *suit under the Lemon Law,* but not prior to pursuing relief under the newly created State's Attorney General arbitration program applying Lemon Law, or prior

Arbitration ... which are binding on GM under the consent decree" (citation omitted) is woefully misguided. Yet this is the dissenter's "principal disagreement" with our opinion. Adherence to that view, in effect, replaces the opinion of Dean W. Determan for the judgment of this court. For similar reasons, we have declined to give talismanic weight even to the FTC's view, expressed in its brief *amicus curiae* submitted upon the invitation of the district court, that its Consent Order does not preempt the statute at

issue. 703 F.Supp. at 1106. *But cf.* Statement of FTC Chairman Oliver (Consent Order preempts the Lemon Law). *Id.*

4. General Motors makes several allusions to this aspect of the Lemon Law with slightly varying interpretations. *See, e.g.,* Appellee's Brief at 8, 9, 23; Affidavit of Francis H. Dunne, Assistant General Counsel, General Motors Corporation.

to seeking judicial relief outside the Lemon Law.[5] In effect, subdivision (g) creates an exhaustion requirement which makes participation in a manufacturer's existing dispute resolution mechanism a prerequisite to seeking judicial relief under the Lemon Law. In our view, this statutory scheme neither harms the consumer nor unconstitutionally burdens federal regulation.

The Lemon Law not only permits three separate avenues of relief to remain available to the consumer—the GM–BBB program, New York's Attorney General arbitration mechanism, and judicial relief—but these routes of redress become meaningful under its terms. In various subtle but significant ways these forums differ as vehicles for affording relief—for example, the consumer may have to pay a filing fee under the State's mechanism while GM's is generally free;[6] GM's program is binding only on the manufacturer while the State's is binding on both.[7] Accordingly, we view the Statute's exhaustion requirement as merely inducing use of the manufacturer's program, while preserving the consumer's option to choose between the State's and GM's arbitration programs. These features are not contrary to the intent of the Consent Order which assures that consumers will receive fair and equitable decisions when they submit to GM's arbitration program.

We now address the thrust of GM's complaint: namely, the requirement that its arbitration program must comply with the substantive decisional criteria and record-keeping procedures of the Lemon Law.

B. Other Requirements

GM claims that it is inconceivable that the FTC intended to permit state regulation of issues covered by the Consent Order in light of its "having negotiated a detailed agreement, having gone through a lengthy comment process, and having resolved debated issues about the decree." We draw the opposite inference.

When Congress legislates in a field traditionally occupied by the states, "we start with the assumption that the historic police powers of the States were not to be superseded by [federal law and agency action] unless that was the clear and manifest purpose of Congress." *Pacific Gas & Electric Co. v. Energy Resources Comm'n*, 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983) (quoting *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Preemption "is not lightly to be presumed." *California Federal Savings*, 479 U.S. at 272, 107 S.Ct. at 685. Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to

---

**5.** The dissenter overlooks this aspect in describing the statute's purpose as merely "to allow manufacturers voluntarily to establish an arbitration program that would be a mandatory first step for consumers under the Lemon Law."

Subdivision (k) and paragraph 10 of the "NEW CAR LEMON LAW BILL OF RIGHTS," however, make it clear that resort to the manufacturer's program is a precondition to a law suit seeking Lemon Law relief, but not to the State's alternative mechanism. Paragraph 10 states:

AS AN ALTERNATIVE TO THE ARBITRATION PROCEDURE MADE AVAILABLE THROUGH THE MANUFACTURER, YOU MAY INSTEAD CHOOSE TO SUBMIT YOUR CLAIM TO AN INDEPENDENT ARBITRATOR, APPROVED BY THE ATTORNEY GENERAL. YOU MAY HAVE TO PAY A FEE FOR SUCH AN ARBITRATION. . . .

**6.** The Consent Order, § IV. C., provides that the GM–BBB program be conducted at no charge to the consumer "[f]or two years after the date of

service of this Order." After November 15, 1985, "no charge shall be imposed on consumers by General Motors or the third-party arbitrator that exceeds charges specified in the Uniform Rules of Arbitration published by the Better Business Bureau."

Section 6 of the BBB's Rules provides:
The BBB will provide or arrange for facilities to hold your arbitration hearing and it will maintain records of your arbitration proceeding. If you want a transcript or tape recording of the proceedings, or if you bring your own lawyer or paid witnesses, you are responsible for these costs.

**7.** While subdivision (k) does not inform the consumer that an award under the State's program would be binding on the consumer as well as on the manufacturer, this apparently would follow from its cross reference to N.Y.Civ. Prac.L. & R. Article 75. *See* Richard R. Givens, Practice Commentaries, N.Y.Gen.Bus.Law § 198–a at 317 (McKinneys 1988).

preempt is required in this area. *See Envtl. Encapsulating Corp. v. City of New York*, 855 F.2d 48, 58 (2d Cir.1988); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 697 F.Supp. 726, 730 (S.D.N.Y. 1988).

■ As the Supreme Court has cautioned:

> To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

*Hillsborough County*, 471 U.S. at 717, 105 S.Ct. at 2377. This concern is reinforced by the imbalance that a finding of preemption would create among car manufacturers. If we read the Consent Order to preclude all state regulation of the GM–BBB arbitration program, GM would gain an immunity from state law while manufacturers who establish voluntary dispute resolution mechanisms would have to comply with the Lemon Law.[8] Although we are mindful that the GM–BBB program was intended to be "experimental," we are unable to infer that the FTC Order also intended to grant GM such special insulation.

Moreover, the references to state law found in the documents incorporated into the Consent Order indicate that the FTC did not intend the Order to "occupy the field" of consumer warranty law and arbitration between GM and its disgruntled consumers. Conceivably, the boilerplate reference to state law found in Section 3 of the BBB rules may encompass only choice of procedural laws governing arbitration. GM's claim, however, that Section 27B of the BBB Rules which provides that an arbitrator may make any fair and equitable decision "provided state law does not prohibit all or part of that decision" only refers to substantive law outside the context of the arbitration process seems strained:

> This provision means that no decision can require any party to perform an action that would put the party in jeopardy under any other law. For example, if an arbitrator decides a vehicle would achieve better fuel economy if the catalytic converter were removed, he may not "award" the removal of the catalytic converter in contravention of state law. Similarly, an arbitrator could not order seat belts removed as part of a remedy, where cars were required to have them. Again, however, this provision does not and is not intended to substitute state substantive law for the sense of fairness judgment of the arbitrator as to what remedy, if any is appropriate.

Affidavit of Dean W. Determan.[9]

Determan's first and last statements are contradicted by the examples on which he relies. While his scenarios may be correct, we fail to discern in Section 27B a distinction between state law which establishes a manufacturer's obligations with respect to the safety features (personal or environmental) of a car and state law which establishes a manufacturer's duties with respect to remedying defects. In our view, for example, it should follow logically from these illustrations that an arbitrator should

---

**8.** The Magnuson–Moss Warranty—Federal Trade Commission Improvement Act, §§ 101 *et seq.*, codified at 15 U.S.C. §§ 2301 *et seq.* (1982) ("Magnuson–Moss"), regulates voluntary dispute mechanisms. In a recent case pending appeal before this court, some of the same provisions of New York's Lemon Law—namely, the training, notice and recordkeeping requirements—were found preempted by the Act. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 697 F.Supp. 726 (S.D.N.Y.1988). *See also, Wolf v. Ford Motor Co.*, 829 F.2d 1277 (4th Cir.1987) (consumer won a verdict under state lemon law, but state common law fraud action was preempted by Magnuson–Moss). *But cf. Auto. Importers of America v. State of Minn.*, 871 F.2d

717 (8th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989) (state lemon law not preempted by Magnuson–Moss); *Chrysler Corp. v. Texas Motor Vehicle Comm'n*, 755 F.2d 1192 (5th Cir.1985) (same). The central issue here of decisional criteria and remedies was not before the district court. In any event, because the instant case concerns a federally mandated program and not a voluntary mechanism, Magnuson–Moss is inapposite.

**9.** Former General Counsel of the Council of Better Business Bureaus and Vice President in Charge of its Mediation/Arbitration Division.

not be allowed to award the fair value of a defective transmission on the fifth attempt at repair—an arguably equitable award—where state law requires a full refund or replacement of the "lemon" vehicle after the fourth attempt.

Nor do we find compliance with both the decisional criteria under the Lemon Law and the FTC Consent Order impossible. Under the FTC Order, arbitrators are "free to make common sense adjudications based on their own sense of fairness." Certainly in some circumstances an untrained arbitrator in the manufacturer's program which sets no guidelines might arrive at an award other than that prescribed under the Lemon Law. A mere difference in results, however, does not render the two schemes incompatible. In addition, we note that the Lemon Law supplies specific statutory standards and relief only in the limited area of "lemons." While establishing what constitutes a reasonable number of repair attempts and prescribing the terms of automatic redress (*i.e.*, refund or replacement), the Statute, like the FTC order, otherwise defers to the discretion of the arbitrator in fashioning appropriate relief.

It follows from our analysis that the Lemon Law requirements of training and additional recordkeeping are not preempted. The New York Statute merely requires that arbitrators be "trained in arbitration" and "familiar with" the Law's provisions. There is no requirement that they be "formal" or "professional" arbitrators in conflict with the Consent Order. The recordkeeping requirements of section 198–a(m)(3) are not in conflict with the extensive reporting requirements under the Consent Order.

Ostensibly, the purpose of the FTC Consent Order is to assure consumers fair and equitable treatment when submitting complaints about a vehicle's performance to GM's arbitration program. GM does not argue that application of the Lemon Law standards of liability and redress necessarily would be unfair or inequitable. Instead, GM argues that the state legislation is preempted because it disrupts the goal of nationwide uniformity engendered in the

Order and violates the specific compromise that was struck in the bargaining process. We reject each of these arguments for similar reasons.

While the Order calls for a "nationwide" program, it does not mention the word "uniform." Because the goal of consumer protection can be achieved without resort to nationwide uniformity, we decline to equate the two by inferring the latter. Similarly, we do not accept GM's argument that the Lemon Law is inconsistent with the FTC Consent Order because the Order struck a specific compromise—standardless resolution binding only on GM—in lieu of a broad sweeping program of automatic redress designed to aid consumers. While the compromise that was struck did not include federal uniform standards of fairness and equity, there is no evidence that it precluded further regulation by the states.

Before concluding, we pause to give further consideration to the objections of our colleague. According to Judge Winter, GM's establishment of an arbitration program "appears to be mandatory.... [which] appears to be the result of sheer happenstance in legislative drafting...." This view is clearly contrary to the record and to the all-inclusive language of section 198–a(g). Indeed, GM chose to enter into a consent order with the FTC, mandating the implementation of a nationwide third-party arbitration program, to avoid unpleasant litigation arising out of the FTC's 1980 complaint. Neither intentionally nor inadvertently has New York singled out GM for disparate treatment. Any manufacturer that places itself in a similar situation would be subject to the same requirements.

The dissenting opinion also argues that "the issue before us is not the traditional preemption question of whether a federal policy or procedure invalidates a state policy or procedure.... [but] whether New York is unnecessarily interfering with a federal remedial procedure." We fail to discern anything novel or untraditional in this restatement of the law. Moreover, dual state and federal regulation in a given area may assume various forms; *e.g.*, the state regulation may operate in tandem

with or independent of the federal law. The instant FTC Consent Order does not indicate any intent to insulate GM's program from supplementation by state regulation. Since the Lemon Law primarily supplies standards for what is fair and equitable, application of its standards and remedies (which leave wide discretion to the arbitrator) by arbitrators in the GM program does not unnecessarily interfere with the open-ended federal remedial measures.

Finally, we emphasize our belief that the result we reach is principled and fair—not "mischie[vous]," as the dissenter unwisely characterizes it. Companies will not be dissuaded from entering into consent decrees involving BBB arbitration because of our decision. Rather, they will be mindful of the need to bargain for preemption in the specific compromises they reach.

## CONCLUSION

For the foregoing reasons we reverse the order of summary judgment and dismiss the complaint below.

WINTER, Circuit Judge, dissenting:

I agree with my colleagues that a consent decree with the force of federal law may preempt a state statute. However, I disagree with them as to the preemptive effect of the Federal Trade Commission ("FTC") consent decree in issue. This case involves a highly unusual legal and factual situation, and I approach it rather differently from my colleagues.

The first unusual aspect is that the New York statute appears to have an effect on General Motors ("GM") entirely different from its effect on every other manufacturer. The statutory provision in question was designed to allow manufacturers to operate their own arbitration programs where they choose to do so and to require consumers to resort in the first instance to the manufacturer's program, if one exists. The statute was thus intended to allow manufacturers voluntarily to establish an arbitration program that would be a mandatory first step for consumers under the Lemon Law. Counsel for the defendants conceded at oral argument that this provision was for the benefit of manufacturers. However, it appears to be mandatory for GM because the arbitration provisions of the FTC consent decree are treated as a manufacturer's arbitration program for purposes of the law in question.[1] This appears to be the result of sheer happenstance in legislative drafting, for there is no evidence that the New York legislature ever intended to single out GM or that New York has any policy goal or reason to make maintenance of an arbitration program mandatory for GM and not its competitors.

The second unusual aspect arises from the first. The legal issue before us is not the traditional preemption question whether a federal policy or procedure invalidates a state policy or procedure. No one is arguing that New York cannot enact a Lemon Law and provide arbitration, including optional manufacturers' arbitration, as one remedy. New York could also have declared that arbitration programs mandated by federal law are not to be used for Lemon Law enforcement but that manufacturers bound to such federal programs could establish separate programs for Lemon Law purposes. Even if New York wanted to single out GM and mandate that it maintain an arbitration program, it could have required GM to establish a second program separate from that under the consent decree. Every policy goal of the legislation in question could thus easily have been achieved without creating even an arguable preemption issue.

The question is not whether a New York policy or procedure can coexist with a federal policy or procedure but whether New York can provide that a federally mandated remedial procedure be used to enforce its local policy even though it could have provided for an identical procedure under state law. A finding of preemption here would thus in no way lessen New York's power to

1. The question whether the statute applies to GM's arbitration program is not raised in the present case.

enact substantive regulation and provide a comprehensive arsenal of remedial procedures concerning automobiles or other consumer products. Cases relied upon by my colleagues that caution against unnecessary interference with the exercise of state police powers are beside the point. The question rather is whether New York is unnecessarily interfering with a federal remedial procedure.

My colleagues conclude that New York or any other state's use of the federal procedure is valid because the FTC consent decree was designed to be a vehicle for the enforcement of state substantive law. I disagree. It is virtually indisputable that the decree was intended to authorize arbitrators to issue decisions based solely on their view of common sense and equity without regard to state substantive law, unless that law expressly forbade the result. The language incorporated into the original decree stated that the arbitrator "may make any decision, which the Arbitrator deems to be fair and equitable ..., provided state law does not prohibit all or part of that decision." Rule 27B, Uniform Rules for Better Business Bureau Arbitration, *reprinted in* FTC Consent Order, 102 F.T.C. 1741, 1774. Moreover, the lack of either state or federal standards was the basis for FTC Commissioner Pertschuk's dissent and defendant Attorney General Abrams' opposition to the decree before it was adopted by the FTC.

Whatever the evidence of language and intent, however, the matter is settled by an examination of the Uniform Rules for Better Business Bureau Arbitration, 102 F.T.C. at 1771–74, which are binding on GM under the consent decree. It should be understood that the Better Business Bureau ("BBB") rules have an application beyond the FTC consent decree. They bind businesses of all kinds across the nation who have agreed to participate in the BBB arbitration program. They thus have a life of their own apart from this litigation, including a history of interpretation and operational practice. My principal disagreement with my colleagues concerns their view that these rules are somehow to be interpreted without regard to how the BBB

arbitration program has actually operated for many years and without regard to how the BBB and other parties to these rules, who have no connection with the present litigation, interpret them.

The quality of available evidence as to the meaning and operation of the BBB rules is exceptional. In the record and unchallenged by the defendants is an affidavit of Dean W. Determan, former General Counsel of the Council of Better Business Bureaus, Inc., and Vice President in charge of its Media/Arbitration Division. Mr. Determan authored the rules in question and for many years supervised the BBB arbitration program, during which he was responsible for interpreting the rules.

Among other things stated by Mr. Determan in that affidavit is that the BBB rules incorporated in the FTC order "provided that arbitrators' decisions were to be based on equity and not on state legal principles. This has continued to be the operating premise of the program." Mr. Determan further stated that the BBB program has trained more than 25,000 persons nationwide to be BBB arbitrators and has instructed them

> to apply their own concept of fairness to the facts in the cases they hear. They are not taught the various state laws which would apply if the disputes they were hearing had been brought in court. In fact, while the arbitrators are told that they may allow parties to present the substantive law from the state where they are sitting, or even from other states, they are specifically instructed that they are not to apply any particular law, but instead are to do what they personally believe is right.
>
> ... It is specifically understood that under the BBB Rules arbitrators should not enforce established legal principles such as the Uniform Commercial Code, warranty law, or any other substantive law, except as those principles might form the basis of the arbitrator's independent common sense and ideas of fairness.

Mr. Determan's affidavit also shed light on the two references to state law in the BBB rules. He specifically stated that Section 3—"The law of the state where your dispute is arbitrated shall apply," 102 F.T.C. at 1771—was designed only "to settle questions of choice of procedural law," and was

included to anticipate situations in which a consumer lives in one state, but is serviced by a BBB located in a different state. For example, New York law requires eight days' notice of an arbitration hearing, but New Jersey only requires seven. This provision does not and is not intended to incorporate state substantive law into the arbitration decisional process.

My colleagues rely heavily upon Section 27B—"The Arbitrator may make any decision, which the Arbitrator deems to be fair and equitable ..., provided state law does not prohibit all or part of that decision," 102 F.T.C. at 1774—as compelling an arbitrator to follow state substantive law. With regard to that Section, Mr. Determan stated,

This provision means that no decision can require any party to perform an action that would put the party in jeopardy under any other law. For example, if an arbitrator decides a vehicle would achieve better fuel economy if the catalytic converter were removed, he may not "award" the removal of the catalytic converter in contravention of state law. Similarly, an arbitrator could not order seat belts removed as part of a remedy, where cars were required to have them. Again, however, this provision does not and is not intended to substitute state substantive law for the sense of fairness judgment of the arbitrator as to what remedy, if any, is appropriate.

I thus conclude that the Lemon Law, as interpreted, is in palpable conflict with the consent decree. The BBB arbitration program expressly precludes application of state substantive law. The New York statute commands it. BBB arbitrators are not trained in state law and are instructed that its use is not mandatory. The New York statute commands that the arbitrators be trained in the Lemon Law and follow it. Compliance by GM with the consent decree and with the Lemon Law as interpreted is thus not possible, *see Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), unless the BBB, which is not under any legal duty to comply with the Lemon Law, voluntarily cooperates both in revising the standards followed by its arbitrators and in allowing its arbitrators to be retrained.

I would note further that my colleagues' decision creates the potential for considerable mischief extending far beyond this case. Companies will hereafter be rather more cautious in entering into federal consent decrees providing for arbitration programs that may later be put to unanticipated uses. Certainly, no counsel for a manufacturer will recommend agreeing to a consent decree involving BBB arbitration. Moreover, because this decision concludes that a particular state warranty law governs BBB arbitration and that BBB arbitrators are not properly trained, the decision suggests that as a matter of law the BBB has been misinterpreting and misadministering its arbitration program all these years. As a result, mischief may follow for businesses and consumers in other industries as well. Litigation claiming that BBB arbitration has not applied state substantive law, until now unthinkable, has been made more likely.

Finally, I would note that my colleagues' exertions are rather pointless other than to single out GM for harsher treatment. If we were to hold that New York could not use the FTC arbitration program as a vehicle to impose its own substantive law, GM would be restored to the position held by all other automobile manufacturers in the State of New York and would have a choice whether to set up an arbitration program (in its case, a second program) for use under the Lemon Law. I therefore dissent.