[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this summary process action, the plaintiff, Atlantic Mortgage and Investment Corp. (AMI), seeks to evict Deborah and Michael Pervis from the premises at 194 Beacon Avenue, New Haven. The case was submitted to the court on a stipulation of facts. The facts are as follows. Dennis Dockery and Kenneth Cooper acquired the property at 194 Beacon Avenue in 1992, giving a mortgage to Constitution Mortgage Bankers, Inc. (CMB), on June 12, 1992. The defendant Deborah Pervis[1] entered into a "Section 8" lease[2] on September 1, 1992, with Dockery and Cooper. When-they failed to make the mortgage payment of August 1, 1996, CMB brought a foreclosure action. CMB subsequently assigned the mortgage to AMI on January 14, 1997. A judgment of strict foreclosure was entered on April 3, 1997, and AMI took title to the premises on May 6, 1997. On June 2, 1997, AMI served the defendant with a notice to quit on or before June 9 on the ground that her right to occupy the premises had terminated.
Under state law, a lease is terminated by operation of law upon a judgment of strict foreclosure, and the mortgagee can CT Page 12330 bring a summary process action under General Statutes § 47a-23
(a) (3) on the ground that the tenant's right to possession has terminated. First Federal Bank v. Whitney Development Corp.,237 Conn. 679, 688-89, 677 A.2d 1363 (1996); Lampasona v. Jacobs,209 Conn. 724, 728-29, 553 A.2d 175, cert. denied, 492 U.S. 919,109 S.Ct. 3244, 1061 L.Ed.2d 590 (1989). The defendant contends that federal law preempts state law under these circumstances and protects her from eviction without a showing of good cause by the owner of the property. The issue, then, is one of preemption: whether the Section 8 regulations preempt state law regarding the effect of a foreclosure on a lease. Or, cast in terms of Congressional intent: did Congress intend that Section 8 termination procedures apply to prior mortgagees and their assigns to the exclusion of state law regarding the legal relationship between mortgagees and tenants?
 I
Preemption
The question of preemption is "basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law. U.S. Const., Art. VI, cl. 2."Barnett Bank v. Nelson, 116 S.Ct. 1103, 1107,134 L.Ed.2d 237 (1996).
"Sometimes courts, when facing the pre-emption question, find language in the federal statute that reveals an explicit congressional intent to pre-empt state law. E.g., Jones v. RathPacking Co., 430 U.S. 519, 525, 530-31, 97 S.Ct. 1305, 1309-10,1312-13, 51 L.Ed.2d 604 (1977). More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the federal statute's `structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. Id., at 525, 97 S.Ct. at 1309-10; FidelityFederal Savings Loan Assn. v. De la Cuesta, 458 U.S. 141, 152-53,102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). A federal statute, for example, may create a scheme of federal regulation `so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' Rice v. Santa FeElevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152,91 L.Ed.2d 1447 (1947). Alternatively, federal law may be in CT Page 12331 `irreconcilable conflict' with state law. Rice v. Norman WilliamsCo., 458 U.S. 654, 659, 102 S.Ct. 3294, 3298-99,73 L.Ed.2d 1042 (1982). Compliance with both statutes, for example, may be a `physical impossibility,' Florida Lime Avocado Growers, Inc. v.Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18,10 L.Ed.2d 248 (1963); or, the state law may `stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' Hines v. Davidowitz, 312 U.S. 52, 67,61 S.Ct. 399, 404, 85 L.Ed.2d 581 (1991)." Barnett Bank v.Nelson, supra, 116 S.Ct. 1107-08. "[S]tate laws can be pre-empted by federal regulations as well as by federal statutes."Hillsborough County, Fla. v. Automated Med. Labs, Inc.,471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).
The first two prongs of the preemption test are inapplicable. There is no express language in the Section 8 legislation providing for preemption of state law, and it is clear from the text and scope of the federal statutes, regulations, and case law that Congress did not intend Section 8 to operate exclusively in the area of housing assistance. That leaves the question of whether federal and state law are in irreconcilable conflict with one another.
There is a presumption "against finding pre-emption of state law in areas traditionally regulated by the States." Californiav. ARC America Corp., 490 U.S. 93, 101, 109 S.Ct. 1661,104 L.Ed.2d 86 (1989). "When Congress legislates in a field traditionally occupied by the states, we start with the assumption that the historic police powers of the States were not to be superseded by federal law and agency action unless that was the clear and manifest purpose of Congress . . . . Preemption is not lightly to be presumed . . . . Because [landlord-tenant] law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." (Citations omitted; internal quotation marks omitted.) GeneralMotors Corp. v. Abrams, 897 F.2d 34, 41 (2nd Cir. 1990);Napoletano v. Cigna Healthcare of Connecticut, Inc.,238 Conn. 216, 238, 680 A.2d 127 (1996).
 II
The Section 8 program
Section 8 authorizes a public housing authority to make assistance payments "for the purpose of aiding low-income CT Page 12332 families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f (a) (1990). "Congress adopted the Section 8 housing program to provide decent and safe housing through the private sector to certain `lower income' families, the elderly and the disabled . . . . The statute authorizes the Department of Housing and Urban Development (HUD) or local public housing authorities to contract with private landlords. In exchange for a guaranteed subsidized market rental level, landlords provide apartments to approved families. The family rents the apartment directly from the landlord and pays a fraction of the rent commensurate with family income `. . . from all sources of each member of the household . . .'. 42 U.S.C.A. Sec. 1437f (f) [former (3)]. The balance is paid by the government." Morrisania II Associates v.Harvey, 139 Misc.2d 651, 527 N.Y.S.2d 954, 956 (1988).
Under Section 8 regulations, the housing authority, the family and the owner establish a three-way relationship, connected with three separate, but interrelated, contractual agreements. The first is between the housing authority and the family for rental assistance. 42 U.S.C. § 1437f (o);24 C.F.R. § 982.201. If the family meets the income requirements, the housing authority issues a rental certificate or voucher. 24 C.F.R. § 982.302 (a). The family then locates a privately owned rental unit with an owner willing to participate in the program, and presents a copy of the proposed lease to the housing authority for approval. 24 C.F.R. § 982.302
(c). If necessary, the housing authority may negotiate with the owner concerning the rent. 42 U.S.C. § 1437f (o) (10). The lease between the family and the owner, the second contractual agreement, must incorporate certain provisions from the regulations, including those detailing the conditions under which the lease may be terminated. 24 C.F.R. § 982.308
(2).[3] At the same time, the owner and the housing authority enter into a housing assistance payment (HAP) contract which obligates the housing authority to pay a share of the rent directly to the owner. 42 U.S.C. § 1437f (d);24 C.F.R. § 982.451.
The lease and HAP contract run coterminously for the term of the "assisted tenancy," one automatically terminating when the other does. 24 C.F.R. § 982.309. The tenancy can only be terminated under certain circumstances. "[D]uring the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violations of the terms and conditions of the CT Page 12333 lease, for violation of applicable Federal, State, or local law, or for other good cause." 42 U.S.C. § 1437f (d) (1) (B) (ii);24 C.F.R. § 982.310 (a). "Other good cause" includes, but is not limited to, (i) failure by the family to accept a new lease, (ii) a history or disturbance by the family of others in the neighborhood, (iii) the owner's desire to use the unit for personal or family use or for other than residential rental purposes, and (iv) business or economic reasons.24 C.F.R. § 982.310 (d). The owner must give a written notice to the tenant, with a copy to the housing authority, specifying the grounds for termination, at or before commencement of an eviction action, and may be included in the notice required under state or local law. 24 C.F.R. § 982.310 (e).
If the owner wishes to terminate the HAP contract for a business or economic reason, § 982.455 requires a 90-day notice to the tenant and the housing authority. Section 982.455 describes terminating the HAP contract as "opting out" of the program. In other words, the owner no longer wants to participate in the Section 8 program for business or economic reasons, but does intend to continue renting the premises. The owner does not have to show good cause against the current tenant, but good cause to discontinue renting to Section 8 tenants altogether. SeeTempleton Arms v. Feins, 220 N.J.Super 1, 531 A.2d 361, 369-72, cert. denied, 109 N.J. 489, 537 A.2d 1282 (1987) (discussing good cause standards for opting out). The notice must contain sufficient detail to enable the HUD field office to evaluate whether the owner has good cause and whether there are additional actions that can be taken by HUD to avoid the termination, and "must state that the owner and the housing authority may agree to a renewal of the HAP contract, thus avoiding the termination." 24 C.F.R. § 984.455 (b) (3). Because one of the goals of the program is to make it viable for owners in the private sector to participate, if an owner feels the need to leave the program for business or economic reasons, HUD wants the opportunity to renegotiate the HAP contract so that the owner can continue without undue financial burden.
The regulations do not mention the effect of a conveyance of the leased property, either by sale or foreclosure, on the status of the tenancy. Section 1437f(d) (2) (C) pertains to the duration of contracts for assistance payments made to project-based programs, i.e., assistance that is attached to the structure. The owner of such a building must obligate the successors in interest to the term of the contract with the housing authority. There is CT Page 12334 a brief mention in § 982.310 (d) (iv) that an owner's wish to sell the property is good cause for opting out of the program, but no other mention is made concerning a conveyance of the property subsequent to the lease under the tenant-based program.[4]
 III
Irreconcilable Conflict
The first aspect of the conflict preemption analysis is whether there is actual conflict between the two laws, such that compliance with both state and federal law is physically impossible. Because the body of state law behind the rule at issue involves several areas of law traditionally occupied by the state,[5] "compelling evidence of an intention to preempt is required." General Motors v. Abrams, supra, 897 F.2d 41-42. "In areas of coincident federal and state regulation, United States Supreme Court decisions counsel restraint in seeking out conflicts where none clearly exists." Shea v. First Fed. Savings Loan of New Haven, 184 Conn. 285, 292, 439 A.2d 997 (1981). The analysis must begin "with the assumption that Congress did not intend to displace state law." Maryland v. Louisiana,451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).
The defendant argues that because federal law requires a showing of good cause and state law does not, one of them, the state law, must give way to the federal law. The only case law cited in support of her argument are two Massachusetts trial court decisions; EMC Mortgage v. Smith, Civ. No. 95-04794, Housing Court Dept., City of Boston (January 5, 1996) and FederalHome Loan Mortgage Corp. v. Surzhucov, Civ. No. 95-1487, Housing Court Dept., Hampden County Division (August 9, 1995); and one Connecticut case, Bristol Savings Bank v. John A. Savinelli,
Superior Court, judicial district of New Haven, Docket No. 377478 16 CONN. L. RPTR. 380 (March 21, 1996), which adopted the reasoning ofEMC Mortgage v. Smith, supra. The plaintiff's argument is premised on her interpretation that the federal law requires a showing of good cause by this party, a prior mortgagee taking title after a foreclosure.
The regulation at issue provides that, "[d]uring the term of the lease, the owner may not terminate the tenancy except on the following grounds . . . ." 24 C.F.R. § 982.310 (a); 42 U.S.C. § 1437f(d) (1) (B) (ii). The only evidence the defendant CT Page 12335 offers to support her claim that AMI is bound by this requirement is the broad statutory definition of "owner" as "[a]ny person or entity with the legal right to lease or sublease a unit to a participant." 24 C.F.R. § 982.4; 42 U.S.C. § 1437f (f) (1). She considers this definition adequate evidence from which to infer that "Congress and HUD contemplated the possibility of a change in ownership during a lease term and anticipated that there may be `owners' — like Atlantic Mortgage and Investment — who have not signed a Section 8 lease but who are nevertheless housing a Section 8 tenant." The defendant's argument, resting as it does solely on the word "owner," ignores the "basic tenet of statutory construction that the intent of the legislature is to be found not in an isolated phrase or sentence but, rather, from the statutory scheme as a whole." (Internal quotation marks omitted.) Jupiter Realty Co. v. Board of TaxReview of Vernon, 242 Conn. 363, 369 (1997). "In order to determine the meaning of a statute, we must consider the statute as a whole when reconciling its separate parts in order to render a reasonable overall interpretation." Napoletano v.Cigna Healthcare of Connecticut, Inc., supra, 238 Conn. 235.
The defendant's argument does not consider the statutory scheme as a whole, and thereby overlooks the basis of the landlord's obligations in the contractual relationships established according to the regulations. Her argument, instead, begins by taking a very narrow view of the regulation as imposing a duty to show good cause prior to the termination of the tenancy on the "owner" of the property housing a tenant who took possession under a Section 8 lease, reasoning that because AMI is now the owner of such property by virtue of the foreclosure, the Section 8 requirements apply to it, and therefore the lease and the tenancy it created could not have been terminated by the foreclosure. Ignoring, also, the opening phrase of the regulation, "[d]uring the term of the lease," she does not consider what is being terminated and the legal relationships established by the lease.
The good cause requirement for termination found in24 C.F.R. § 982.310 is incorporated into the lease by the HUD-written lease addendum, which makes the right a contractual, not a statutory, right.[6] Prior to a 1981 amendment, the landlord had to apply to the housing authority for approval before seeking to evict a tenant. The amendment removed the housing authority from the process and allowed landlords to use the eviction proceedings prescribed by state or local law. See Jefferson
CT Page 12336Garden Associates v. Greene, 202 Conn. 128, 144-45, 520 A.2d 173
(1987) (state court could interpret the lease language requiring good cause). The amendment was intended "to clarify that the procedural and substantive rights of a tenant of Section 8 existing housing to occupancy of a particular unit are determined by the terms of the lease, in accordance with State and local law." (Emphasis added.) S. Rep. No. 97-139 (1981), reprinted in 1981 U.S.C.C.A.N. 396, 552. This strongly indicates that Congress did not intend to provide protection beyond what is provided in the lease, and thus only the parties to the lease were to be bound by its provisions. The statutory scheme does not impose obligations on the participants outside the bounds of the contractual relationships it establishes, nor does it impose obligations on non-parties. See O'Brien v. Westerly HousingAuthority, 626 F. Sup. 1065, 1067 (D.R.I. 1986) (no automatic assumption of the contract with the Housing Authority by the new owner); German v. Federal Home Loan Mortgage Corp., 899 F. Sup. 1155
(S.D.N.Y. 1995) (only lease language can bind successors in interest to its terms).
For these reasons, federal law, specifically 42 U.S.C. § 1437f
(f) (1) or 24 C.F.R § 982.4, cannot be construed to apply to a mortgagee who does not establish an independent relationship with the tenant. As discussed supra, nothing in the regulations address the effect on a Section 8 lease of a foreclosure. "[M]atters left unaddressed in such a [a comprehensive and detailed] scheme are presumably left subject to the disposition provided by state law." O'Melveny Myers v.FDIC, 512 U.S. 79, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67
(1994).
 IV
Obstacle to Federal Goal
The second aspect of the conflict preemption analysis looks to the spirit rather than the letter of the federal law to find conflict. The defendant argues that security of tenancy for low-income families was a goal of the Section 8 program, and allowing her eviction would interfere with this remedial purpose.
One of the stated goals of the original legislation in 1974, was "to promote mixed-income housing." 42 U.S.C. § 1437f (a). In contrast to traditional public housing, the Section 8 program was established as an "ongoing public subsidy of an essentially CT Page 12337 private landlord-tenant relationship." Morrisania II Associatesv. Harvey, supra, 527 N.Y.S.2d 957. The program was "to give private developers the incentive for profit and the risk of loss in the construction and management of housing developed for low income families." S. Rep. No. 93-693 (1974), reprinted in 1974 U.S.C.C.N. 4273, 4314.
Under the initial regulations, the local housing authorities were required to approve every termination. In 1981, the statute was amended to modify, among other things, the termination procedures.[7] The housing authority's participation in every termination proceeding had led courts to find sufficient state involvement to implicate the due process clause. See Jeffries v.Georgia Residential Finance Authority, 678 F.2d 919, 925 (11th Cir. 1982), cert. denied, 459 U.S. 971, 103 S.Ct. 302,74 L.Ed.2d 283 (1982), and cases cited therein. By removing the housing authority from the eviction proceedings, Congress intended
 to minimize disturbance of the private relationship under State law between the unit owner and the tenant. The provision of housing opportunities for assisted families depends on voluntary participation by private owners of existing housing. The proposal would assure owners that the procedural and substantive rights of the assisted tenant are the same as those applicable to non-subsidized tenants. The amendment is expected to encourage more owners to participate in the Section 8 existing housing program.
S. Rep. No. 97-139 (1981), reprinted in 1981 U.S.C.C.A.N. 396, 552.
Informed by these federal interests — encouraging mixed-income housing, promoting private landlord-tenant relationships, and making it economically feasible for private participation — this court must consider whether the application of state law would stand as an obstacle to the accomplishment of the federal objectives. Barnett Bank v. Nelson,supra, 116 S.Ct. 1107-08. "[W]e should not reach to find actual conflict if accommodation of both federal and state interests is possible." Times Mirror Co. v. Division of Public UtilityControl, 192 Conn. 506, 516, 473 A.2d 768 (1984).
Promoting the private relationship between landlord and tenant, a relationship based on contractual agreements governed CT Page 12338 by state law, is inconsistent with a federal government guarantee of security of tenancy. Creating a federal status of "subsidized tenant" with federal rights different from non-subsidized tenants could encourage the type of isolation and loss of dignity and independence which is so often the by-product of traditional public housing. See Morrisania II Associates v. Harvey, supra, 527 N.Y.S.2d 957. Moreover, regulation of the landlord-tenant relationship is a matter of strong local concern, and the imbalance at the local level that a finding of preemption would create would disturb "the federal-state balance embodied in [the Supreme Court's] Supremacy Clause jurisprudence." General Motorsv. Abrams, supra, 897 F.3d 42.
In General Motors, the court declined to find preemption of consumer protection laws because it would insulate certain manufacturers from the laws intended by the states to protect consumers, creating an imbalance among manufacturers. Likewise, in this case, a finding of preemption would put landlords willing to participate in Section 8 at a disadvantage with private lenders, by possibly reducing the value of property made available to Section 8 tenants, and making it more difficult for willing participants to find financial backing. Restricting a mortgagee's right to evict tenants would profoundly interfere with the commercial expectations of prior mortgage holders, and could lead to more restrictive mortgaging practices. Consequently, preempting the state law concerning the priority of mortgages over leases would discourage the very goals that Section 8 seeks to advance — the increase of the supply of low income housing.
While housing stability contributes to the overall goal of creating and maintaining mixed-income housing, displacement of tenants in certain circumstances, without depriving them of their entitlement to continued assistance in rent payments, does not substantially interfere with the federal interests at stake. SeeO'Brien v. Westerly Housing Authority, supra, 626 F. Sup. 1071 n. 6 (key property issue implicating due process is the right to the subsidy). There must be actual, significant frustration of the federal purpose before preemption will be justified. Kargman v.Sullivan, supra, 552 F.2d 13.
The presumption against preemption in this case is bolstered further by the analysis in Ayers v. Philadelphia HousingAuthority, 908 F.2d 1184 (3rd Cir. 1990), in which the Third Circuit considered the effect of federal housing law on state CT Page 12339 foreclosure proceedings. The court, in determining whether the federal regulations conflicted with state law or rather incorporated the requirements of state law, approached the question by reference to Kimbell Foods, 440 U.S. at 728-29, which "fashioned a three factor test to determine when, as a general matter, Congress intended to incorporate into Federal law a state's law regulating a particular program which has features that are common to both the federal and state law. The first factor to be considered is whether the particular program requires a uniform law to govern throughout the nation. Second, even when a nationwide uniform law is not required for the proper functioning of the program, we must still determine if the `application of the specific state law would frustrate specific objectives of the federal programs.' Id. Finally, we must consider whether requiring the application of a uniform federal rule `would disrupt commercial relationships predicated on state law.' Id." Ayers, supra, 908 F.2d 1190.
The Third Circuit contrasted two of its earlier decisions,United States v. Walter Dunlap Sons, Inc., 800 F.2d 1232 (3rd Cir. 1986) and United States v. Spears, 859 F.2d 284 (3rd Cir. 1988), and found the controlling difference was the presence of third parties and commercial interests. Ayers, supra, 908 F.2d 1191. "In both Kimbell Foods and Walter Dunlap, the aggrieved parties were not participants in the federal program. They would have been prejudiced by a federal rule preempting the state system of lien priorities of general applicability — statutes on which creditors base their daily commercial transactions." Id. "[T]he critical factor counselling application of state law was the threat to commercial relationships founded on expectations of third parties relying on existing state statutes." Id.; see also Conille v. Secretary of Housing andUrban Dev., 840 F.2d 105, 110 (1st Cir. 1988) (without a significant conflict between federal interests and the use of state law, a federal court would adopt the state rule).
In the present case, with Section 8's explicit reliance on state law in many areas of landlord-tenant regulation, there is no need for, nor any expectation of a uniform national law. Neither would application of the state law substantially frustrate federal objectives. The third factor, whether applying federal law would disrupt commercial relationships predicated on state law, weighs heavily in favor of applying the state law. The present case involves more than the landlord-tenant relationship. The dispute implicates well-established rules of mortgage law CT Page 12340 operating in the realm of finance and real estate, "commercial relationships founded on expectations of third parties relying on existing state statutes." Ayers, supra, 908 F.2d 1191. To interfere with commercial relationships and interests outside the landlord-tenant relationship could discourage private participation in the program. Because the overarching federal interest behind the Section 8 program is to increase the supply of low-income housing in the private sector by providing incentive for owners to participate in the Section 8 program, federal interests would suffer if the Section 8 requirement of good cause were allowed to supersede the workings of state law in regard to prior mortgagees and their assigns.
 V
Given the lack of evidence that Congress intended to provide security against eviction after title to property is transferred, the federal policy interests at stake, and the commercial interests embodied in state law that could be disrupted, this court holds that the Section 8 regulation does not preempt state law under which a lease is terminated by operation of law upon a judgment of strict foreclosure. For this reason, judgment enters for the plaintiff.
LEVIN, J.